UNITED STATES, Appellee,

v.

Specialist Four John L. TANKSLEY,
SSN 461–84–9282, United States
Army, Appellant.

CM 437591.

U. S. Army Court of Military Review.

30 March 1979.

Colonel Edward S. Adamkewicz, Jr., JAGC, Major Benjamin A. Sims, JAGC, Captain Willard E. Nyman, III, JAGC, and Captain R. Wade Curtis, JAGC, were on the pleadings for appellant.

Colonel Thomas H. Davis, JAGC, Major Michael B. Kennett, JAGC, and Captain Carl F. Meyer, Jr., JAGC, were on the pleadings for appellee.

Before MITCHELL, DRIBBEN and FELDER, Appellate Military Judges.

## OPINION OF THE COURT

DRIBBEN, Judge:

Appellant was tried by a general court-martial with members. Contrary to his pleas he was found guilty of aggravated assault upon Staff Sergeant Charles Hopkins by stabbing and cutting him on the back with a knife. The offense was alleged as a violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928. His sentence, approved by the convening authority, extended to a bad-conduct discharge and reduction to the lowest enlisted grade.

I

The circumstances leading to Specialist Tanksley's conviction occurred early on a summer evening in a housing area at Fort Hood, Texas, where appellant and Sergeant Hopkins and their families were next-door neighbors. Apparently, their neighborliness extended no further than their physical proximity to each other. Appellant's wife testified that earlier in the day of 2 August 1978, her son had been taunted by Sergeant Hopkins and her children were subsequently harassed, taunted and challenged by Sergeant Hopkins' son while they were playing. Later that evening, probably due to the earlier difficulties, Specialist Tanksley's son and Sergeant Hopkins' son engaged in a fight across the street from their parents' quarters.[1] Appellant's wife came across the street where she stood watching the fight. According to the testimony of Sergeant First Class Wike and Mrs. Wike, who were in the yard of a nearby neighbor, Mrs. Tanksley made no effort to stop the affray. Within a short time after Mrs. Tanksley's arrival on the scene, Sergeant Hopkins and his wife appeared. Mrs. Hopkins said something to Mrs. Tanksley which apparently precipitated an argument. Again, according to the Wikes' testimony, Sergeant Hopkins, after attempting to stop the fight between the boys, slightly shoved Mrs. Tanksley with both hands, one on each of her shoulders, and then, after further words were exchanged, proceeded to do it again. Mrs. Tanksley was pushed back by this second and harder shove and her glasses flew off her face. These incidents of shoving, described as pretty much instantaneous, were followed by more words between Mrs. Tanksley and the Hopkins. Mrs. Tanksley, according to the Wikes and Staff Sergeant Cantu, another bystander, did not attempt to get away from her assailant nor did it appear to them that she was in danger of either death or serious bodily harm. At this time Specialist Tanksley, carrying a kitchen-type knife, ran across the street in a crouched position, came up behind Sergeant Hopkins, and stabbed him twice in the back.[2]

---

1. According to one witness the fight was "kind of rough because you could hear the slapping or hitting two doors up where we were sitting."

2. One of Sergeant Hopkins' wounds was ten centimeters deep and two or three centimeters long. The attending physician was able to insert his entire hand in the second wound, which was some thirty-five centimeters long, and was unable to feel the bottom of the wound.

Specialist and Mrs. Tanksley describe the latter's altercation with Sergeant Hopkins differently. Mrs. Tanksley testified that Sergeant and Mrs. Hopkins ran up to her and demanded that she tell her "animal son" to get off the Hopkins' boy. After responding that her son was not an animal, Mrs. Tanksley said that Sergeant Hopkins without saying anything to her hit her twice in the face with his fist, knocking her glasses off with the second blow. She also alleged that he continued to hit at her when she was picking up her spectacles from the ground and she thought Sergeant Hopkins was trying to kill her. When she put her glasses back on and looked around, Sergeant Hopkins was on the ground and her husband was asking her if she was alright. Her son, who had by then apparently stopped fighting with Sergeant Hopkins' son, corroborated her testimony. Specialist Tanksley testified that upon seeing Sergeant Hopkins hit his wife in the face with his fists and attempting to hit her while she was retrieving her glasses, he picked up the first thing he could find which turned out to be a knife, ran across the street as fast as he could, hit Sergeant Hopkins in the back, turned him around and asked him, "[W]hat's wrong with you, are you crazy?" He further testified that he believed his wife was about to suffer grievous bodily harm or be killed by Sergeant Hopkins and that he acted instinctively to protect her.

Additional evidence of record reveals that Sergeant Hopkins at the time of this altercation was about to be medically retired from the Army because of a severe psychotic depressive reaction manifested in part by poor impulse control, suicidal and homicidal ideation, inappropriate effect and confusion.[3] He was further described as a very large man, over six feet tall who weighed about 260 pounds. Both Mrs. Tanksley and her husband were considerably smaller, the latter weighing about 165 pounds. The record also reflects that Sergeant Hopkins at one time during the approximately four years both families lived in the neighborhood struck Mrs. Hopkins and tore the telephone from the wall of his quarters. Specialist Tanksley also learned from Sergeant Hopkins that he had assaulted two men at the same time in late 1977, throwing one up against a wall and the other to the floor. Appellant had also been warned by Sergeant Hopkins to keep his children out of his yard and that if appellant wanted to try something, Sergeant Hopkins would beat him about the head with an entrenching tool.

## II

■ Appellant before us and for the first time objects to statements in which the trial counsel allegedly expressed his personal opinion regarding appellant's guilt and the credibility of witnesses. He contends that this was so prejudicial in the absence of a *sua sponte* curing instruction by the military judge as to warrant reversal of his conviction and a rehearing. These remarks occurred during various portions of the trial counsel's argument as to the merits:

. . . I have done my best to try to present, within bounds if we can, a picture of exactly what happened on 2 August.

The courtroom, of course, is no place for passion or sympathy and you must look at the evidence calmly and objectively before arriving at your verdict.

. . . undoubtedly, there was a stabbing and, undoubtedly, the defendant, John Tanksley, did it.

. . . I guess you're called upon here today to just decide if the defendant should be excused for what he did, the stabbing, under the legal theory of defense of another.

---

3. Approximately two months before the altercation with Mrs. Tanksley a medical board which evaluated Sergeant Hopkins in connection with his retirement proceedings concluded that he was not considered dangerous to himself or others at that time. We are unable to ascertain from the record how much appellant knew about Sergeant Hopkins' medical problems. It may reasonably be inferred that while he was aware Sergeant Hopkins was about to receive a medical discharge, he knew little if anything about the diagnosis of the medical board.

For this defense to fail, all I need to show you today was that a reasonable man would not believe that death or grievous bodily harm was about to be committed.

Eyewitnesses, Mrs. Wike, Sergeant Wike, Sergeant Cantu, none of them believed that she was about to be killed or have serious bodily harm inflicted upon her. These were unbiased eyewitnesses and the Government contends they're reasonable people.

. . . if this man believed his wife was in such danger, why didn't he yell to Sergeant Hopkins or run to his wife's aid? Instead, he became angry, is what he did. And, he went to the kitchen and looked for a weapon. Then, he ran across the street, catlike in his approach, and stabbed Sergeant Hopkins without even a warning, without yelling, leave my wife alone, without yelling to his wife, get out of the way or run, without a warning, he jumped on his back and stabbed him. None of the eyewitnesses felt that she was in danger. Gentlemen, I don't think a reasonable man really could at that point.

It's obvious what a reasonable man would have done in these circumstances.

But, she was never swung at or hit. Unbiased eyewitnesses have testified, standing and watching the event, that she was never swung at or hit.

But, in his rage, he ran to the kitchen and exceeded what a reasonable man would have done.

I think that he had his mind made up long before he went in to get this knife, that he was going to get a weapon, long before he saw her glasses fly, long before he realized that she was being shoved around.

I think and the government contends that a reasonable man would have definitely performed differently.

I do claim—the government would contend that a reasonable man would have acted much different. I can only hope now that, from my observations and comments made falling short, that you men apply your intelligence with a little bit of common sense and can supplement any of the shortcomings that I have failed to bring out here today. The government would, respectively (sic) submit that your finding should be guilty as charged.

Then during rebuttal the trial counsel made the following comments:

. . . I don't think this involves a fine point. You don't stab a man for shoving you or your wife, only if she's in serious danger of having her life taken or great bodily harm.

. . . I don't think that if a reasonable man would have interjected himself to the situation, two minutes is too long to expect.

I don't blame them for not entering at that point. I wouldn't want to be there. I wouldn't want to try to stop the man with a knife. What happened here was that the man had taken the law into his own hands.

The Government, after alleging that trial counsel's argument constituted fair comment on evidence properly before the court, argues that failure of the trial defense counsel to object to the alleged improper remarks or to request a curing instruction precludes appellant from asserting this error on appeal. The Government also argues that even if the prosecutor's comments exceeded the bounds of proper argument the instructions which were given by the trial judge cured the error.

### III

■ The Manual for Courts-Martial, United States, 1969 (Revised edition) (MCM);[4] American Bar Association Code of Professional Responsibility (as amended August 1978) (ABA Code);[5] and American

---

4.  MCM 1969, paragraphs 44g (1) and 48c.

5.  ABA Code Disciplinary Rule 7–106(C)(3) and (4) which states:
    (C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

\*    \*    \*    \*    \*    \*

    (3) Assert his personal knowledge of the facts in issue, except when testifying as a witness.

Bar Association Standards, The Prosecution Function § 5.8 and The Defense Function § 7.8 [6] forbid counsel to assert in argument his personal opinion as to the truth or falsity of testimony or evidence or the guilt or innocence of the defendant. Such personal views invade the province of the court members and imply that counsel has superior knowledge of the case beyond the evidence properly adduced or that his personal expertise or position has endowed him with knowledge beyond the reach of others. This improperly tends to increase the probative force of the evidence counsel has legitimately introduced in support of his case. The possibilities of prejudice are especially to be guarded against where such tactics are employed by prosecutors. They represent the sovereign power of the United States of America in the court-martial arena. Their personal opinions may well provide them unauthorized and improper weapons with which to vanquish the accused and thereby deprive him of a fair trial. On the other hand, counsel is accorded great latitude in closing argument including reasonable inferences from the evi-

> (4) Assert his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused, but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.

6. ABA Standards, The Prosecution Function § 5.8 (1971):

> Argument to the jury.
> (a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
> (b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
> (c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
> (d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

dence as will support his theory of the case. The testimony, conduct, motives, and evidence of malice of witnesses may be commented upon as well. Counsel may also argue as though the testimony of his own witnesses conclusively established facts related by them. Paragraph 72*b*, M.C.M.1969 (Rev); *see also Wharton's Criminal Procedure*, § 523 (12th Edition 1975); *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Doctor*, 7 U.S.C.M.A. 126, 21 C.M.R. 252 (1956).

## IV

In resolving the question of the propriety of the closing arguments of the trial counsel, our conclusion will depend, as it does in most jurisdictions, including we believe, the military, upon whether the alleged expressions of personal opinion are in fact only that or whether they are merely deductions from the evidence properly adduced at trial and incorporated in the prosecutor's argument that the Government met its burden of proof.[7]

> The defense counsel is also subject to similar professional and legal guidelines in ABA Standards, The Defense Function § 7.8 (1971).
> Paragraph 2–32, Army Regulation 27–10, Military Justice, No. 1968, Change 17, 15 August 1977, sets forth the application of the ABA Code and Standards relating to the Prosecution and Defense Functions to counsel in Army courts-martial.

7. The propriety and effect of a prosecuting attorney's argument to a jury indicating his belief or knowledge as to the guilt of an accused is the subject of an extensive annotation in 50 A.L.R.2d 766. This area of the law is also discussed with numerous case citations in *Wharton's Criminal Procedure*, § 524, *supra*. There are some cases in which statements by the prosecuting attorney indicating directly or indirectly his opinion, belief or knowledge as to the guilt of the accused even when such statements purport to be based upon the evidence introduced at trial are held to be error. These are also discussed in the foregoing publications. The propriety, and prejudicial effect thereof, of comments by counsel vouching for credibility of witnesses is annotated in 81 A.L.R.2d 1240 and in *Wharton's Criminal Procedure*, § 525, *supra*. The thrust of these annotations is that if counsel's argument as to credibility of the witness is supported by the evi-

An Army Board of Review in the case of *United States v. Shipley*, 14 C.M.R. 342 (A.B.R.1954) *pet. denied* 15 C.M.R. 431 (1954), upheld the trial counsel's comment that in his opinion the specification's allegations had been proved. The board drew a distinction between the expression of a personal opinion of guilt and a statement of belief that the adduced evidence satisfied the Government's burden of proof. Soon thereafter another Army Board of Review concluded that counsel may argue or express his opinion as to guilt where he states, or it is apparent, that his opinion is based only on the evidence as distinguished from his *personal* opinion (emphasis that of the Board). *United States v. Weller*, 18 C.M.R. 473 (A.B.R.1954). In the leading case of *United States v. Doctor, supra*, the accused was convicted of false swearing. During his closing argument on findings, the trial counsel called the accused a psychopathic liar and a schemer who would falsify to anyone. In fact the trial counsel applied the term "liar" to the accused some twenty times during his argument. In that case Lieutenant Colonel Doctor took the stand and flatly contradicted the government witnesses. Moreover, as the court's opinion points out, either the accused or the government's witnesses were falsifying. In that posture of the evidence, it appears that the trial counsel was indirectly, if not outrightly, expressing his personal opinion as to the guilt of the accused. The United States Court of Military Appeals held that since the comments were "based on matters found within the record" they were fair comments on the evidence.

Our understanding of the American Bar Association Standards relating to the Prosecution Function and Disciplinary Rule 7–106(C)(3 and 4) of the ABA Code, *supra*, footnote 6, is consistent with the case law discussed. Included in the commentary appended to § 5.8 of the Prosecution Function is the following at page 128, paragraph b:

> The line between permissible and impermissible argument is a thin one. Neither advocate may express his personal opinion as to the justice of his cause or the veracity of witnesses. Credibility is solely for the triers, but an advocate may point to the fact that circumstances or independent witnesses give support to one witness or cast doubt on another. The prohibition goes to the advocate's personally endorsing or vouching for or giving his opinion; the cause should turn on the evidence, not the standing of the advocate, and the witnesses must stand on their own.

Appellant's attempt to equate the argument of the trial counsel to that of the prosecutor in the case of *United States v. Knickerbocker*, 2 M.J. 128 (C.M.A.1977), falls short of the mark. In that case trial counsel's comments in his closing argument as to the merits were clearly and unequivocally expressions of personal opinion unwarranted by the evidence adduced at trial. After characterizing Private Knickerbocker's testimony in such terms as "that fairy tale" and as "foolishness", the trial counsel compounded his error by telling the court members that " . . . in fact in my mind there is no doubt whatsoever" that the accused is guilty. Although the majority of the Court of Military Appeals cited no authority in support of their holding in *United States v. Knickerbocker, supra*, it appears to be consistent with the decisions in *United States v. Shipley, United States v. Weller*, and *United States v. Doctor*, all *supra*, and American Bar Association Standards, The Prosecution Function § 5.8. Chief Judge Fletcher in his concurring opinion also measures the trial counsel's remarks by § 5.8, American Bar Association Standards governing the conduct of the

---

dence adduced at trial and the appearance of the witness it is usually regarded as proper. *See generally* Haight, *Argument of Military Counsel on Findings, Sentence and Motions: Limitations and Abuses*, 16 Mil.L.Rev. 59

(1962), and annotation in 40 L.Ed.2d 886 entitled *Supreme Court's Views As To What Courtroom Statements Made by Prosecuting Attorney During Criminal Trial Violate Due Process or Constitute Denial of Fair Trial.*

prosecutor in criminal proceedings and the principles set forth in *Doctor, supra.*[8]

## V

■ In cases, involving the propriety of the trial counsel's argument, lack of objection by the defense counsel at the trial normally constitutes a waiver which precludes consideration of the issue on appeal. *United States v. Collins*, 3 M.J. 518 (A.F.C. M.R.), *pet. granted* (other issues) 3 M.J. 344 (C.M.A.1977); *United States v. Neal*, 12 U.S.C.M.A. 723, 31 C.M.R. 309 (1962); *United States v. Doctor, supra; United States v. Brassell and Pickney*, 47 C.M.R. 305 (A.C.M. R.1973), *affirmed sub nom., United States v. Pickney*, 22 U.S.C.M.A. 595, 48 C.M.R. 219 (1974). *See also United States v. Buckholtz*, 47 C.M.R. 177 (A.C.M.R.1973), *pet. denied* 22 U.S.C.M.A. 633 (1973). However, an appellant will not be penalized on appeal by his trial defense counsel's oversight where the trial counsel's argument is so egregiously improper as to call for the trial judge to interrupt and *sua sponte* give necessary curative instructions to the court members.[9] *See United States v. Shamberger*, 1 M.J. 377 (C.M.A.1976), and *United States v. Nelson*, 1 M.J. 235 (C.M.A.1975).

## VI

■ Applying the law to the argument at bar we do not believe that it was so egregiously improper as to call for the trial judge to interrupt and *sua sponte* give curing instructions to the court members. Concededly, the trial counsel's argument was something less than worthy of emulation, especially in his all to frequent and unnecessary use of the personal pronoun "I" when the words "the Government contends" would have been preferable. Nevertheless it remained within the bounds of propriety. We note that the trial counsel commenced his comments by identifying himself as "spokesman for the Government" and on occasion prefaced his points with the words "the Government contends." We find that the trial counsel did not personally vouch for the credibility of his witnesses. He did, within permissible limits, argue as specifically permitted by paragraph 72*b*, MCM, as though the testimony of his own witnesses conclusively established facts related by them. The credibility of witnesses was an appropriate subject of discussion in this instance where the testimony was in conflict and the verdict in large part depended upon which witnesses were believed. We also find that the trial counsel's alleged expressions of personal opinion as to the guilt of the appellant were also merely deductions from the evidence properly adduced at trial and incorporated in his argument that the Government had met its burden of proof. We further find that any possible ambiguities in the trial counsel's argument that may possibly have been construed as personal opinion were adequately offset by the trial judge's instructions on findings to the effect that counsel's arguments are not evidence and the court members are not to give them any further credence or attach to them any more importance than the court members' own recollections of the evidence compel.

The findings of guilty and the sentence are affirmed.

Senior Judge MITCHELL and Judge FELDER concur.

---

8. Our reading of Judge Cook's opinion in which he was joined by Judge Perry causes us to part company with Chief Judge Fletcher when he intimates that the majority opinion is a "gut reaction" and contends that the majority action in effect severely limits if not totally overrules, the standard in *United States v. Doctor, supra* footnote 4, at 131.

9. Lack of objection by the defense counsel at trial is some indication of the minimal impact of the trial counsel's remarks on the court members. *United States v. Nelson, supra; United States v. Saint John*, 23 U.S.C.M.A. 20, 48 C.M.R. 312 (1974); *United States v. Ryan*, 21 U.S.C.M.A. 9, 44 C.M.R. 63 (1971).